UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARSILIO LANGELLA,

                Plaintiff,

   -against-

MAHOPAC CENTRAL SCHOOL DISTRICT;
ANTHONY DICARLO, *Superintendent of Schools*;
DENNIS CREEDON, *Former Superintendent of Schools*;
JOHN AUGUSTA, *Athletic Director / Former Interim
Principal*; MICHAEL SCLAFANI, *Former Board
President*; BRIAN MAHONEY, *Former Board Vice
President*; RONALD CLAMSER, *Former Human
Resources Director / Assistant Superintendent*,

                Defendants.

No. 18-cv-10023 (NSR)
OPINION & ORDER

---

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/5/2022 _____**

---

NELSON S. ROMÁN, United States District Judge

       Plaintiff Marsilio Langella ("Plaintiff" or "Langella") brings this action against

Defendants Mahopac Central School District ("Mahopac" or the "District"), Anthony DiCarlo,

Superintendent of Schools for the District ("DiCarlo"), Dennis Creedon, Former Superintendent

of Schools for the District ("Creedon"), John Augusta, Former Athletic Director and Former

Interim Principal of Mahopac High School ("Augusta"), Ronald Clamser, Former

Superintendent/Human Resources Director for the District ("Clamser"), Michael Sclafani, Former

Board President for the District ("Sclafani"), and Brian Mahoney, Former Board Vice President

for the District ("Mahoney") (collectively, "Defendants").   (Second Amended Complaint

("SAC"), ECF No. 44.)  Plaintiff asserts claims under the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12101 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794, and the

New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, alleging discriminatory and retaliatory conduct stemming from his age and his disability.  (*Id.*)  Plaintiff also asserts state common law claims of defamation and tortious interference with contract.  (*Id.*)

Presently before the Court is Defendants' motion to dismiss Plaintiff's Second Amended Complaint.  (ECF No. 52.)  For the following reasons, Defendants' motion is GRANTED.

## BACKGROUND

The below facts are drawn from the SAC and are assumed true for purposes of this motion.

## I.      Background on Langella

Langella is a 55-year-old tenured chemistry teacher employed by Mahopac.  (SAC ¶¶ 1, 15.)  He has suffered from deafness in his right ear and tinnitus since 1994.  (*Id.* ¶ 16.)  He has suffered from hypertension and heart disease and underwent unspecified heart surgery to address these issues in 2011.  (*Id.*)  As a result of Plaintiff's hearing issues, he allegedly speaks at a louder volume while coaching and teaching which has been (wrongly) interpreted as "thuggishness" or an attempt to intimidate others.  (*Id.* ¶ 17.)

Langella has been teaching at Mahopac High School ("MHS") since 2000 and is currently subject to a Teacher Improvement Plan.  (*Id.* ¶ 18.)  Under this plan, Langella must meet with the current school principal every two weeks.  (*Id.*)  In addition to his work as a chemistry teacher, Langella was an assistant varsity football coach from 2001 until 2014, and, as detailed below, he served as head varsity football coach in the fall of 2016.  (*Id.* ¶ 19.)  Langella received additional compensation for his coaching work.  (*Id.*)

## II.     Langella's Head Coach Application

Langella applied for the head varsity football coach position at MHS in January 2016.  (*Id.* ¶ 20.)  Thereafter, he participated in two interview sessions for the position and learned that Mahopac was soliciting coaching applications from outside of the District (allegedly in

contravention of the operative collective bargaining agreement) and that he was the only in-district employee applicant who had applied for the head coach position. (*Id.* ¶ 21.) On January 28, 2016, during the second interview, Creedon (then Superintendent) asked Langella if he was close to retirement. (*Id.* ¶ 23.) A month later, on February 22, 2016, former Athletic Director Augusta said that Langella had been "loud" during the second interview and that, as a result, several members of the Mahopac School Board (the "Board") requested a private meeting with him. (*Id.* ¶ 24.) Langella advised Augusta that he spoke at a higher volume because he has a hearing impairment. (*Id.*) In response, Augusta repeatedly asked if Langella could hear Augusta's remarks, which Langella asserts were condescending or mocking inquiries. (*Id.* ¶ 25.)

On or about March 2, 2016, the relevant teachers' union filed a "grievance" alleging that the Board had violated the operative collective bargaining agreement by considering applicants outside of the District for the football coach position. (*Id.* ¶ 30.) Several days later, on March 8, 2016, a meeting was held between the Board and Langella. (*Id.* ¶ 26.) Creedon, Sclafani (then-Board President), and Mahoney (then-Board Vice President) were in attendance. (*Id.*) At the meeting, Sclafani asked Langella "are you not close to retirement?" (*Id.* ¶ 29.) Sclafani also explained that Langella was part of the "old guard," which is why head coaching applications were being solicited from outside of the District. (*Id.* ¶ 27.) Similarly, Mahoney expressed his concern that, with Langella's loud voice, the community would consider him a "thug coach" which Langella states was a negative characterization of his disability or an express example of Defendants using his disability as a negative factor in assessing his ability to perform his job. (*Id.* ¶ 28.)

That grievance was resolved on March 23, 2016. (*Id.* ¶ 30.) Thereafter, Langella was appointed to the head coach position. (*Id.*) Plaintiff alleges that the only reason he was eventually

hired for this position was because of a union grievance he filed and that the District was under "duress" because of the grievance. (*Id.* ¶ 22.)

## III.   Langella's Tenure as Head Coach

Langella alleges that Defendants purportedly began a discriminatory and retaliatory campaign against him after he accepted the head coach position. (*Id.* ¶ 31.) For example, in April 2016, Augusta told Langella that the football team could not weight train on school grounds and instead had to be bussed to a local gym. (*Id.* ¶ 32.) This resulted in Langella having to organize daily transportation to an off-site gym. (*Id.*) A few months later, on June 24, 2016, Augusta claimed that Langella broke locks on lockers in the varsity athletic locker room in order to falsify a basis for terminating him at some undetermined point in the future. (*Id.* ¶ 33.)

Later, in September 2016, unspecified members of the District "forced one of Langella's three assistant coaches to resign" and left Langella responsible for coaching 60 players "with only three paid coaches." (*Id.* ¶¶ 34–35.) Even though Langella was promised additional compensation for his herculean efforts, *i.e.*, coaching a high school football team with one less coach, he never received such compensation. (*Id.* ¶ 35.)

On October 19, 2016, after the start of the 2016–2017 school year, Augusta called Langella into his office and accused him of using foul language during football practice. (*Id.* ¶ 36.) As a result, Augusta placed a letter of counseling in Langella's personnel file. (*Id.*) Augusta called Langella back to his office on November 1, 2016 and accused him of making threatening statements at a pregame speech before a football game. (*Id.* ¶ 37.)

In January 2017, Langella started hearing rumors from unidentified football coaches that he would be replaced. (*Id.* ¶ 38.) Then, on April 5, 2017, the Board placed another physical education position into the budget. (*Id.*) Two days later, on April 7, 2017, Assistant Superintendent Clamser called Langella into his office and informed him that he would be

receiving a second letter of counseling in his file because of (1) the lock cutting incident, (2) the threatening statements made during his pregame speech, (3) Plaintiff's use of foul language, and (4) his announcement of assistant coaches prior to the Board's approval. (*Id.* ¶ 39.) Clamser also informed Langella that he would not be reappointed as head coach based on these false claims. (*Id.*) Nevertheless, on April 24, 2017, Langella officially applied to be head coach for the Fall 2017 season. (*Id.* ¶ 40.) He never received an interview nor was his application ever acknowledged by the Board. (*Id.*)

On June 23, 2017, the last day of school, Clamser gave Langella his second letter of counseling that was discussed during the April 7, 2017 meeting. (*Id.* ¶ 41.) Langella's union threatened to file a grievance against an unspecified entity with regards to the lock cutting incident (presumably to advance a theory that the lock cutting incident was false). (*Id.*) As a result of the threatened grievance, Clamser revised the letter to remove those specific claims. (*Id.*)

On or about June 26, 2017, the District hired Dominick DiMatteo to replace Langella as the head varsity football coach at MHS. (*Id.* ¶ 42.) DiMatteo was also given the physical education position created by the District in April 2017. (*Id.*) Langella previously alleged that DiMatteo was 45-years-old when hired (making him Langella's junior by 7 years and within the same protected age group under the ADEA). (ECF No. 40 at 12.) Now Plaintiff vaguely asserts that DiMatteo is "significantly younger than Mr. Langella" and "does not suffer from a hearing disability." (SAC ¶ 43.)

## IV.   Student Complaints Lodged Against Langella and Defendants' Disciplinary Actions

On October 27, 2017, Langella's home was egged and vandalized by four MHS students. (*Id.* ¶ 44.) Three of these students were members of the football team that Langella coached. (*Id.*) On November 7, 2017, following a police investigation into the incident, the District suspended the four students from school. (*Id.* ¶ 45.)

That same day, one of the students filed a Dignity for All Students Act ("DASA") claim against Langella.  (*Id.*)  The student alleged that members of the football team coaching staff, including Langella, verbally abused him during the 2016 season.  (*Id.*)  The District did not inform Langella about the DASA complaint for over 90 days, allegedly violating school policy.  (*Id.*)

On December 5, 2017, a second DASA claim was lodged against Langella.  (*Id.* ¶ 46.) This student complained that Langella had called him "Irish eyes."  (*Id.*)  As a result of this allegation, Matt Lawrence, MHS's principal, suspended Langella from his teaching duties, with pay, from December 5, 2017 until December 12, 2017.  (*Id.*)  When Langella returned on December 13, 2017, Lawrence informed him that, at Creedon's request, he would have a teaching assistant in his classroom.  (*Id.* ¶ 47.)

Because of the stress of the DASA complaints, and on the advice of his physician, Langella took a medical leave of absence.  (*Id.* ¶ 48.)  Langella returned to work on January 2, 2018 and was immediately directed by Creedon to complete DASA training.  (*Id.* ¶ 49.)  Plaintiff complied with this directive.  (*Id.*)  However, on January 12, 2018, a third DASA claim was filed against Langella.  (*Id.* ¶ 50.)  This complaint alleged that in September 2016, when he was the varsity football coach, Langella punched a student's testicle.  (*Id.*)  Creedon suspended Langella with pay and reassigned him to his home.  (*Id.*)

V.      **Langella Files of a Notice of Claim and EEOC Charge and Receives Additional Discipline**

On or about February 5, 2018, Langella filed an administrative charge of discrimination with both the United States Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("DHR").  (*Id.* ¶ 13.)  On or about February 15, 2018, Langella filed a Notice of Claim with the District.  (*Id.* ¶ 51.)  A General Municipal Law 50-h hearing was conducted on or about April 9, 2018.  (*Id.*)

On March 29, 2018, Principal Lawrence released a letter to District parents containing the contents of an October 19, 2017 counseling letter, along with other allegations. (*Id.* ¶ 52.) This October 19, 2017 letter contained allegations that Langella used foul language on the football field. Plaintiff has submitted the contents of this March 29, 2018 letter under seal.

On April 6, 2018, Langella attended a meeting with Lawrence, Human Resources Director Debra Legato, Grievance Union Representative Adam Dusenberry, and Union Chief Grievance Officer Dave Gordon. (*Id.* ¶ 54.) During the meeting, Langella was informed that he would be given the findings from the 90-day DASA investigation; however, no findings were provided. (*Id.*) Then, Legato handed Langella an undated Teacher Corrective Action Plan that was placed in his file. (*Id.*) Langella was told to return to work the following workday. (*Id.*)

Notwithstanding the directives at this meeting, DiCarlo, who had replaced Creedon as Superintendent on or about March 2018, informed Langella not to return to his original assignment. (*Id.* ¶ 55.) Instead, DiCarlo informed Langella that he would be writing curriculum in a District office for the remainder of the school year. (*Id.*) Later, on April 23, 2018, Mike Perna, a Union Representative, provided a draft Letter of Reprimand signed by DiCarlo regarding the DASA allegations. (*Id.* ¶ 56.) Langella refused to sign the letter, and it was eventually withdrawn and never placed in his personnel file. (*Id.*)

The next month, on or about May 31, 2018, DiCarlo advised Langella that he would be returning to his full-time teaching duties as a high school chemistry teacher in September 2018. (*Id.* ¶ 57.) Later, Langella alleges that he was not granted a summer professional development school teacher training stipend, which he had received in prior years, causing him salary loss. (*Id.* ¶ 58.) He further avers that he lost work opportunities during his periods of reassignment, as well as sick days during his period of reassignment from teaching duties. (*Id.*)

**VI.     Langella Receives Right to Sue Letter and Subsequently Files Suit**

On August 15, 2018, the EEOC issued a Right to Sue Letter to Langella.  (*Id.* Ex. A (ECF No. 44-1).)  Thereafter, on October 30, 2018, he commenced this action.  (ECF No. 1.)

## LEGAL STANDARD

Under Rule 12(b)(6), courts must assess whether a complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).  A court must accept all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id.* at 662.  A claim is facially plausible when the facts pleaded allow a court to make "a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## DISCUSSION

In his SAC, Plaintiff asserts federal claims of discrimination, retaliation, and hostile work environment.[1]  (SAC ¶¶ 60–77.)  Plaintiff also asserts similar state law discrimination claims under

---

[1]     Plaintiff again argues the continuing violation doctrine in order to salvage claims arising out of events occurring before the 300-day timeframe that was established in this Court's previous opinion. Plaintiff's claims are premised on the alleged remarks made to him prior to his hiring and disciplinary actions prior to the 300-day timeframe.  (SAC ¶¶ 20–33.)  However, the conduct alleged within the 300-day timeframe, failing to rehire Plaintiff as football coach, initiating DASA disciplinary investigations, suspending Plaintiff with pay, and other disciplinary conduct—are plainly "discrete acts" that cannot be covered by the continuing violation doctrine.  *Pratt v. Brennan*, No. 18-CV-4799 (KMK), 2020 WL 364195, at *5 (S.D.N.Y. Jan. 22, 2020).  Although Plaintiff alleges several new acts that could contribute to his claims, he has failed to allege at least one act that occurred within the 300-day filing period.

the New York State Human Rights Law.  N.Y. Exec. Law § 290 *et seq.*  Lastly, Plaintiff alleges

state law claims of defamation and tortious interference with contract.  Defendants seek to dismiss

each of these claims, arguing that many of Plaintiff's claims are still time-barred, and those that

are not time-barred fail to plausibly state actionable claims.  (Defs.' Mem. of Law in Further

Support of Motion to Dismiss ("Defs. Mot."), ECF No. 54.)  The Court addresses the parties'

contentions below.

## I.      Plaintiff's Federal Claims

Consistent with Plaintiff's Amended Complaint, the SAC pleads several varieties of federal

claims pursuant to the ADA, ADEA, and RA, including: (1) discrimination, (2) retaliation, and (3)

hostile work environment.  The Court addresses the viability of each of these three types of claims

under each statute in order.

### A.      Discrimination Claims Pursuant to the ADA, RA, and ADEA

#### 1.      ADA/RA Claims

As noted in this Court's previous opinion, "the standards under the [ADA and RA] are

generally the same." *Wright v. N.Y.S. Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).  Also, "where,

as here, the subtle distinctions between the statutes are not implicated, courts 'treat claims under

the two statutes identically.'"  *Hill v. LaClair*, No. 9:20-CV-0441 (DNH/ATB), 2020 WL

2404771, at *7 (N.D.N.Y. May 11, 2020) (quoting *Wright*, 831 F.3d at 72); *accord Seitz v. New*

*York State*, No. 2:18-CV-4149 (PKC) (LB), 2019 WL 4805257, at *12 (E.D.N.Y. Sept. 30, 2019)

("Claims of disability discrimination brought pursuant to Title I of the ADA and the Rehabilitation

Act are analyzed under the same standards.").

---

*Garcia*, 188 F. Supp. 3d at 359.  Therefore, any claimed discrimination, retaliation, or hostile work
environment claim under the ADEA and ADA that accrued prior to April 11, 2017 is time-barred.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To sufficiently plead a claim for employment discrimination under the ADA, a plaintiff must demonstrate that (1) his or her employer is subject to the ADA; (2) he or she was disabled within the meaning of the ADA; (3) he or she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) he or she suffered an adverse employment action because of the disability.  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)).  At the motion to dismiss stage, "a plaintiff need only give plausible support to a minimal inference of discriminatory motivation."  *Dooley v. Jetblue Airways Corp.*, Fed. Appx. 16, 19–21 (2d Cir. 2015) (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)).  Similarly, under the RA, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

In the prior Opinion and Order dismissing the Complaint, this Court reasoned that Plaintiff failed to plead a disability under the ADA.  Defendants contend in their current motion to dismiss that Plaintiff has not cured this defect.  The Court agrees with Defendants.

Under the ADA, "[a] qualifying disability 'must limit a major life activity and the limitation must be substantial.'" *O'Hara v. Bd. of Coop. Educ. Servs., S. Westchester*, No. 18-CV-8502 (KMK), 2020 WL 1244474, at *12 (S.D.N.Y. Mar. 16, 2020) (quoting *Pugliese v. Verizon N.Y., Inc.*, No. 05-CV-4005, 2008 WL 2882092, at *10 (S.D.N.Y. July 9, 2008)).  "In other words, the

ADA protects only a limited class of persons—individuals who suffer from impairments significantly more severe than those encountered by ordinary people in everyday life." *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 300 (S.D.N.Y. 2003) (internal quotations and citations omitted).

To successfully plead a qualifying disability under the ADA, a plaintiff "must allege which major life activity or activities their impairment substantially affects." *Laface v. E. Suffolk BOCES*, No. 2:18-cv-1314 (ADS) (AKT), 2020 WL 2489774, at *10 (E.D.N.Y. May 18, 2020). "'Major life activities' include: 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.'" *Andino v. Fischer*, 698 F. Supp. 2d 362, 378 (S.D.N.Y. 2010) (quoting 42 U.S.C. § 12102(2)(A)).  It is "well-established that an impairment does not significantly restrict a major life activity if it results only in mild limitations." *Collins v. Giving Back Fund*, No. 18 Civ. 8812 (CM), 2019 WL 3564578, at *13 (S.D.N.Y. Aug. 6, 2019) (quoting *Whalley v. Reliance Grp. Holdings, Inc.*, No. 97 Civ. 4018(VM), 2001 WL 55726, at *4 (S.D.N.Y. Jan. 22, 2001)).  Moreover, it is not enough for a plaintiff to only "allude to her [or his] impairments in her [or his] pleadings; she [or he] must plead *how* those impairments significantly impacted her [or his] major life activities." *Id.*

In the SAC, as in the Amended Complaint, Plaintiff points to two medical issues at the heart of his ADA and RA claims: (1) his hearing impairment (deafness in his right ear) and tinnitus, and (2) his hypertension and heart disease.  (SAC ¶¶ 16–17.)  Yet Plaintiff has again failed to plausibly allege that either condition constitutes a disability within the meaning of the ADA. Plaintiff does not allege how, if at all, his hypertension or heart disease impacts a major life activity.  *Williams*, 2020 WL 906386 at *5 (holding that allegations that plaintiff suffered from

severe hypertension, without any explanation of how it substantially limited one or more major life activities, did not satisfy the ADA's definition of disability).

Plaintiff's claims related to his hearing impairment are similarly deficient.  The only effects of his hearing impairment that Plaintiff alleges are his need to speak loudly and the negative reactions of coworkers to his loud voice.  "Not every impairment is a 'disability' within the meaning of the ADA."  *Williams*, 2020 WL 906386, at *4 (quoting *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005)).  The SAC is devoid of any allegation—plausible or otherwise—that indicates how Plaintiff's life activities are significantly restricted due to his hearing impairment.  At most, the Court can discern that Plaintiff's "deafness in his right ear" causes him to speak at a higher volume and renders negative reactions from his coworkers.  (SAC ¶ 22.) But the fact that Plaintiff has to speak at a higher volume at the displeasure of his coworkers does not render his condition a disability under the ADA.  *See Fraterrigo v. Akal Sec., Inc.*, No. 06 Civ. 9861(SHS), 2008 WL 4787548, at *5 (S.D.N.Y. Oct. 29, 2008) (noting, on summary judgment, that, in the absence of evidence establishing that plaintiff's hearing loss substantially impacted a major life activity, plaintiff failed to establish a disability under the ADA).  Relatedly, Plaintiff has not plausibly alleged a causal nexus between the decision not to rehire him and his disability.  Instead, statements by certain Defendants that Plaintiff had a loud voice were made over a year before the re-hiring and disciplinary decisions at issue and in a different context.

Accordingly, Plaintiff's ADA and RA claims are dismissed without prejudice.

### 2.    *ADEA Claims*

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  This protection covers "individuals who are at least 40 years of age."  *Id*. § 631(a).

To state an ADEA discrimination claim, a plaintiff must allege that (1) he or she was "within the protected age group," (2) he or she was "qualified for the position," (3) he or she "experienced adverse employment action," and (4) "such action occurred under circumstances giving rise to an inference of discrimination." *Green v. Town of E. Haven*, 952 F.3d 394, 403 (2d Cir. 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010)). On a motion to dismiss, a court "need determine only 'whether the allegations in the complaint give plausible support to the reduced prima facie requirements that arise . . . in the initial phase of a litigation.'" *Miller v. Dep't of Educ. of City of N.Y.*, No. 17-CV-594 (JPO), 2018 WL 1468703, at *2 (S.D.N.Y. Mar. 23, 2018) (quoting *Dressler v. City Sch. Dist. of N.Y.C.*, No. 15-cv-3696 (JPO), 2016 WL 4367967, at *3 (S.D.N.Y. Aug. 15, 2016)).

This Court previously found the "disciplinary letters and false accusations from the District," along with Plaintiff's suspension with pay as alleged in the Amended Complaint and the SAC, were held not to be adverse employment actions because "excessive scrutiny without a tangible negative consequence to the employee does not rise to the level of an adverse employment action." *Langella v. Mahopac Cent. Sch. Dist.*, No. 18-cv-10023 (NSR), 2020 U.S. Dist. LEXIS 95588, at *19 (S.D.N.Y. May 31, 2020) (citing *Nidzon v. Konica Minolta Bus. Solutions, USA, Inc.*, 752 F. Supp. 2dd 366, 350 (S.D.N.Y. 2010)). On the other hand, as the Court also found, Plaintiff's contention that he was not rehired for the varsity football head coach position plausibly establishes a material adverse employment action. *See, e.g.*, *Hausdorf v. N.Y.C. Dep't of Educ.*, No. 17-CV-2115 (PAE)(SN), 2018 WL 1871945, at *6 (S.D.N.Y. Jan. 25, 2018), adopted by, 2018 WL 895657 (S.D.N.Y. Feb. 14, 2018) (concluding that a decision not to rehire plaintiff as a softball coach for the next school year constituted a materially adverse change in working conditions).

In an ADEA action, a plaintiff must provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Luka v. Bard College*, 263 F. Supp. 3d 478, 484–85 (S.D.N.Y. 2017) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)).  Previously, the Court dismissed Plaintiff's ADEA claim to the extent it was based on the District's failure to rehire him because Plaintiff failed to adequately plead discriminatory intent.

As an initial matter, Plaintiff once again points to the relative youth of Plaintiff's replacement as head coach.  This Court, in its previous dismissal, already found this contention insufficient to establish discriminatory intent and remains persuaded that the age difference between DiMatteo and Plaintiff does not support an inference of discriminatory intent.

Separately, Plaintiff alleges two new, albeit similar, allegations to establish proof of discriminatory intent.  First, Plaintiff points to a March 8, 2016 comment by Board President Sclafani about Plaintiff being close to retirement.  Second, Plaintiff alleges that certain instances in which he was confronted for alleged misconduct—*e.g.*, disciplinary letters in response to the lock cutting incident—were pre-textual reasons based on ageism to unseat him as a football coach.

By way of recap, the few age-related comments alleged in Plaintiff's first Amended Complaint were not enough to establish that the District had discriminatory intent.  "The ADEA does not make all discussion of age taboo," *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997), and any suggestion of discriminatory intent is undermined by Plaintiff's admission that he was hired by the District when he was within the protected age group and replaced by someone who was also within the protected age group. *See Pustilnik*, 2019 WL 6498711 at *6; *Spires v. MetLife Grp., Inc.*, No. 18-CV-4464 (RA), 2019 WL 4464393, at *8 (S.D.N.Y. Sept. 18, 2019) ("Although the ADEA does not necessarily foreclose an age-discrimination claim when a plaintiff was over

forty years old when first hired, this substantially weakens any inference of discrimination on Defendants' part.").  As discussed below, Plaintiff's new allegations are still insufficient to indicate discriminatory intent.

Plaintiff's new allegation that Defendant Sclafani asked him "are you not close to retirement?" on March 8th is not sufficient to indicate discriminatory effect based on its relative lack of temporal proximity with the alleged discriminatory actions.  The question was asked over a year before the re-hiring and disciplinary actions at issue and accordingly is too remote to provide indicia of discriminatory intent for actions taken over one year later.  The causal relation that Plaintiff attempts to establish between the comments and the eventual adverse employment action is too attenuated.  *See Luka*, 263 F. Supp. 3d at 487 (explaining that remarks about age that were neither "made close in time nor in relation to the specific employment decision" did not raise an inference of discrimination).  Therefore, even with this additional remark, the SAC nonetheless alleges only "stray remarks" that lack a plausible nexus to Defendants' purported discriminatory conduct.  *Id*.

Separately, though unclear, Plaintiff appears to assert that disciplinary proceedings against him were manufactured as a pretext to terminate him and that, in reality, the true reason for the decision to not rehire him was based on age discrimination.  The Court concludes that these allegations are insufficient to permit a plausible inference of discriminatory animus because they are unduly speculative and not based in fact.  There is an insufficient nexus between the false accusations and Defendants' alleged age-based animus.  For example, Plaintiff asserts that he was subjected to false accusations that he cut locks and that he received an unjust disciplinary letter from Defendants even though they were aware that he did not cut any locks.  Even though the alleged conduct by Defendants is offensive, the disciplinary letter was issued roughly one year

before any replacement coach was hired, and is too attenuated to support an inference of discriminatory intent.

Likewise, Plaintiff's conclusory allegations that multiple disciplinary proceedings against him—*e.g.*, a letter of counseling for using foul language on the football practice field—were "a pretext based on ageism and [intended to manufacture] false reasons to unseat him as a varsity football coach" are too vague to survive a motion to dismiss. At bottom, "[t]he subjective belief of [Plaintiff] that there was discrimination afoot—'however strongly felt'—is insufficient to satisfy his burden at the pleading stage.'" *Lenart v. Coach Inc.*, 131 F. Supp. 3d 61 (S.D.N.Y. 2015) (quoting *Doe v. Columbia University*, 101 F.Supp.3d at 371, 2015 WL 1840402, at *11); *see also Dooley v. JetBlue Airways Corp.*, No. 14–CV–4432 (JMF), 2015 WL 1514955, at *3 (S.D.N.Y. Apr. 1, 2015) (holding that the plaintiff's "repeated assertions that [the defendant's] actions can only be the product of discrimination lack any factual support and, thus, do not constitute circumstances giving rise to a plausible inference of . . . discriminatory intent").

Accordingly, Plaintiff's ADEA discrimination claims are dismissed without prejudice.

### B.    Retaliation Claims

As noted in this Court's previous opinion, retaliation claims under the ADEA and the ADA are analyzed under the same framework. *Smith v. N.Y.C. Dep't of Educ.*, No. 18 Civ. 8545 (PGG), 2019 WL 6307471, at *11 (S.D.N.Y. Nov. 25, 2019) (citing *Cerni v. J.P. Morgan Sec. LLC*, 208 F. Supp. 3d 533, 538 (S.D.N.Y. 2016); *Treglia v. Town of Manilus*, 313 F.3d 713, 719 (2d Cir. 2002); *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002)). To establish a prima facie case of retaliation, a plaintiff must plead that "(1) the employee was engaged in an activity protected by [the applicable statute], (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Furk v. Orange-Ulster*

*BOCES*, No. 15-cv-6594 (NSR), 2016 WL 6560408, at *3 (S.D.N.Y. Nov. 2, 2016).   At the pleading stage, the allegations of retaliation "need only give plausible support to the reduced prima facie requirements." *Littlejohn*, 795 F.3d at 316.   In other words, "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015).

To plead causation, a plaintiff must allege "that his [or her] protected activity was the but-for cause of the adverse employment action." *Ninying v. N.Y.C. Fire Dep't*, 807 Fed. Appx. 112, 115 (2d Cir. 2020); *Bailey v. Mount Vernon City Sch. Dist.*, No. 17-CV-9973 (KMK), 2020 WL 1528481, at *12 (S.D.N.Y. Mar. 30, 2020) (explaining that "recent Second Circuit decisions . . . conclusively establish [] that 'but-for' causation is required for each of Plaintiff's claims," including retaliation).   However, "where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

This Court previously held that Plaintiff's retaliation claims were inadequately pleaded in the Amended Complaint because the protected activity and adverse employment action were deeply attenuated and "courts in this Circuit generally hold that a gap longer than two months severs the inferred causal relationship" is needed to establish retaliation. *Graham v. Macy's, Inc.*, No. 14 Civ. 3192 (PAE), 2016 WL 354897, at *9 (S.D.N.Y. Jan. 28, 2016); *Knox v. Town of Southeast*, No. 11 Civ. 8763(ER), 2014 WL 1285654, at *11 (S.D.N.Y. Mar. 31, 2014) ("Indeed, many of the decisions in this Circuit that have addressed the issue have held that a passage of more

than two months between the protected activity and the adverse employment action does not allow for an inference of causation.").

The Court clearly expressed in its previous Opinion that Plaintiff failed to allege that that his protected activity was the but-for cause of allegedly retaliatory acts including the creation of a corrective action plan, a draft letter of reprimand, the DASA accusations, and the denial of per session opportunities and a summer stipend. In Plaintiff's SAC and opposition papers, Plaintiff almost entirely points to the same retaliatory acts without addressing the underlying deficiency that this Court previously addressed—*i.e.*, that the retaliatory conduct was premised on complaints filed prior to Plaintiff's protected activity.  Accordingly, the Court concludes once again that Plaintiff has still failed to establish that protected activity was the but-for cause of corrective action plan, a draft letter of reprimand, the DASA accusations, and the denial of per session opportunities and a summer stipend.

More persuasively, Plaintiff offers the new allegation that Defendants retaliated against him roughly two months after his EEOC filing when, on March 29, 2018, Defendant Lawrence released a letter to parents containing the false counseling letter previously issued to him on October 19, 2016.  While there is a far closer temporal connection between this action and the protected activity, Plaintiff nonetheless has failed to plausibly allege causation.  The dissemination of the letter did not occur in a vacuum and, as pled, it was premised on and built off of "gradual adverse job actions [that] began well before [] [P]laintiff had ever engaged in any protected activity," such that "an inference of retaliation does not arise."  *Slattery*, 248 F.3d at 95; *Lawtone-Bowles v. City of New York*, 2019 WL 652593, at *5 (S.D.N.Y. Feb. 15, 2019) ("[W]here the pleadings reveal 'adverse [disciplinary] actions [that] were both part, and the ultimate product, of an extensive period of progressive discipline' that began before any protected activity, the Court

will not infer retaliatory animus based on temporal proximity alone.").  Instead, as alleged, months

prior to the filing of the EEOC charge, Plaintiff had been subjected to the very false accusations

that would eventually be detailed in the letter disseminated to parents after the EEOC charge.

Accordingly, Plaintiff has failed to adequately allege proximate cause sufficient to state a claim

for retaliation.

### C.      Hostile Work Environment Claims

In order to prevail on a hostile work environment claim, a plaintiff must show that "the

harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment.'"  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.

2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *see also Oncale v.

Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 78 (1998) (stating that a hostile work environment

is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment").  "As a general rule, incidents must be more than

'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"

*Alfano*, 294 F.3d at 374 (quoting *Perry*, 115 F.3d at 149).

The Court previously dismissed Plaintiff's hostile work environment claims because he

failed to allege that Defendants' conduct was sufficiently severe and pervasive.  At most, the

alleged comments, whether viewed in isolation or together, were minor offensive utterances, and

there was no indication—directly or indirectly—that the comments unreasonably interfered with

Plaintiff's work performance.  In the SAC, Plaintiff repeats most of the same deficient allegations

while adding two events that could contribute to his hostile work environment claim.  First,

Plaintiff now alleges that, during a February 22, 2016 meeting, Defendant "continually made

derogatory or mocking comments [by] asking Mr. Langella if he could hear him."  (SAC ¶ 25.)

Second, Plaintiff also newly alleges that, at a March 8, 2016 meeting, Defendant Mahoney expressed concern that the community would consider Plaintiff a "thug coach" due to his loud voice.  At this same meeting, Plaintiff alleges that Defendant asked whether he was close to retirement.

Even with these additional allegations, Plaintiff has, by his own admission premised a hostile work environment claim based on "several comments regarding his age," that he was "asked by Defendants when he would retire" and "[c]omments . . . that he spoke too loudly."  (Pl's Opp. at 25.)  Instead of complaining of "his daily working conditions," like the plaintiff in *Terry v. Ashcroft,* 336 F.3d 128 (2d Cir. 2003), Plaintiff here only alleges "sporadic and isolated events." Accordingly, although Plaintiff alleges that negative comments were made on "numerous occasions," he has not shown that they were more than "isolated acts, [which] do not meet the threshold of [] pervasiveness." *Lenart*., 131 F. Supp. 3d at 69 (quotation omitted); *see also Brown v. Coach Stores, Inc.*, 163 F.3d 706, 713 (2d Cir. 1998) (holding that a supervisor's occasional racist remarks "fail[ed] to constitute discriminatory behavior that is sufficiently severe or pervasive to cause a hostile environment").

Separately, Plaintiff has not alleged that Defendants' conduct was sufficiently severe to survive a motion to dismiss.  "Courts must distinguish between merely offensive or boorish conduct and conduct that is sufficiently severe or pervasive as to alter the conditions of employment," *O'Dell v. Trans World Entm't Corp.*, 153 F.Supp.2d 378, 386 (S.D.N.Y. 2001) (internal quotation marks omitted), based on "whether it is physically threatening or humiliating, or a mere offensive utterance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  Here, Plaintiff does not allege any comments that unreasonably interfered with Plaintiff's work performance.

Instead, comments regarding his voice being loud or sounding thuggish were, at most, minor "offensive utterances."

Accordingly, Plaintiff has failed to plausibly allege any hostile workplace claim and the Court dismisses such claims without prejudice.

## II.      State Law Claims

### A.      NYSHRL Claims

As this court previously noted, Plaintiff's NYSHRL claims will be analyzed in the same way as their federal counterparts.  Since Plaintiff has not established a discrimination claim, he has not satisfactorily established aider and abettor liability.  Because Plaintiff's federal discrimination claims are dismissed, Plaintiff's NYSHRL claims are dismissed.

### B.      Defamation

To state a claim for defamation under New York law, a plaintiff must allege "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Gargiulo v. Forster & Garbus Esqs.*, 651 F. Supp. 2d 188, 192 (S.D.N.Y. 2009) (citing *Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dep't 1999)).  A plaintiff must plead the defamatory statements with some particularity.  N.Y. C.P.L.R. 3016(a) ("In an action for libel or slander, the *particular words* complained of shall be set forth in the complaint." (emphasis added)).  This requires a plaintiff to "identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published."  *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 790 (S.D.N.Y. 2019) (quoting *Neal v. Asta Funding, Inc*., 13 CV 2176 (VB), 2014 WL 3887760, at *3 (S.D.N.Y. June 17, 2014)).

Plaintiff cures some of the defects in his original complaint by identifying the District parents as the third parties to whom the statements were published. However, Plaintiff nonetheless fails to plead "the particular words complained of." N.Y. C.P.L.R. 3016(a). Plaintiff, at best, vaguely suggests the contents of the allegedly defamatory March 29, 2018 letter by stating that it "contained the contents of the false counseling letter previously issued to him in October 19, 2016, as well as containing other false allegations of incidents on dates where these incidents could not have even occurred." (SAC ¶ 52.) This sort of pleading is insufficient as New York courts strictly construe C.P.L.R. 3016(a) to require more direct allegations as to the contents of the defamatory statement. *Scalise v. Herkimer, Fulton, Hamilton & Otsego Cnty. BOCES*, 16 A.D.3d 1059, 791 N.Y.S.2d 786 (4th Dep't 2005) ("Merely paraphrasing the statements . . . warrants dismissal of the defamation action.").

Recognizing this deficiency, Plaintiff filed the letter in question under seal, revealing the contents of the defamatory statements. However, in considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a district court must limit review "to the allegations contained within the four corners of [Plaintiff's] complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998). Further, "New York's C.P.L.R. § 3016(a) requires that the particular words complained of be set forth in a complaint alleging libel or slander." *Sandler v. Simoes*, 609 F. Supp. 2d 293 (E.D.N.Y. 2009). Plaintiff's attempt to attach this extra information to his memorandum of law is insufficient, and the particular defamatory statements must be included in his complaint. Plaintiff's defamation claim is accordingly dismissed without prejudice.

## C.   Tortious Interference with Contract

Plaintiff claims that Defendants tortiously interfered with his contract with Kennedy Catholic by releasing the aforementioned March 2018 letter to Kennedy Catholic. The elements of a tortious interference with contract claim are (a) the existence of a valid contract with a third

party; (b) a defendant's procurement of the contracting party's breach of that contract without justification; and (c) damages to plaintiff resulting therefrom. *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 424 (1996). This Court previously dismissed Plaintiff's tortious interference with contract claim because Plaintiff had failed to allege (1) the terms of the alleged contract, (2) that the contract was between him and a contracting third party, (3) how the contracting party breached the contract, and (4) that the Defendants acted in an intentional manner, and without justification, to procure any alleged breach. Here, Plaintiff cures a number of these elements. However, Plaintiff nonetheless fails to allege that the contracting party actually breached the contract resulting in damages to the Plaintiff. Plaintiff only alleges that the contracting party, Kennedy Catholic, approached him about Defendant's alleged "interference" but does not allege that he was relieved of his teaching duties or suffered any adverse employment action from Kennedy Catholic. (SAC ¶ 53.) New York state courts have held that "tortious interference with contract requires . . . actual breach of the contract." *Lama Holding Co.*, 88 N.Y.2d at 424. Accordingly, Plaintiff's tortious interference with contract claim is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Second Amended Complaint is GRANTED. Plaintiff's claims for discrimination, retaliation, and hostile work environment under the ADA, ADEA, RA, and NYSHRL, and his defamation claim are dismissed without prejudice. Plaintiff's tortious interference with contract claim is dismissed with prejudice. The Court grants Plaintiff leave to file a third amended complaint regarding those claims not dismissed with prejudice. If he chooses to do so, Plaintiff has 21 days, until January 26, 2022, to file his third amended complaint. Defendants are then directed to answer or otherwise respond by February 25, 2022. Failure to file an amended complaint within the time allowed, and without

good cause, will result in the dismissal of Plaintiffs claims with prejudice. The Clerk of Court is

directed to terminate the motion at ECF No. 52.

Dated:     January 5, 2022                                      SO ORDERED:
           White Plains, New York

                                             _____
                                                   NELSON S. ROMÁN
                                                 United States District Judge